# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| I.A.M. NATIONAL PENSION FUND, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )  Civil Action No. 3:15-cv-196-CLS |
| | ) |
| LISTERHILL TOTAL MAINTENANCE CENTER, LLC, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs — the I.A.M. National Pension Fund ("the Fund"), and Robert Roach, Jr., and Henry C. Eickelberg, the Co-Chairmen of the Fund's Board of Trustees — filed this action on February 2, 2015, on behalf of the participants and beneficiaries of the Fund. The defendant is the Listerhill Total Maintenance Center, LLC ("Listerhill"). Plaintiffs assert that Listerhill violated Section 515 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1145 ("ERISA"), by failing to make required contributions to the Fund on behalf of its employees.[1] The case currently is before the court on plaintiff's motion for summary judgment,[2] and defendant's cross-motion for summary judgment.[3] Upon consideration of the

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 37.

[3] Doc. no. 44.

motions, briefs, and evidentiary submissions, the court concludes that both motions should be denied.

## I. STANDARDS OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

[t]he mere existence of some factual dispute will not defeat summary

judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

> "Cross motions for summary judgment do not change the standard." *Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)). "Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts." *Id.*; *accord Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) ("When considering motions from both parties for summary judgment, the court applies the same standard of review and so may not resolve genuine issues of material fact. Instead, [the court must] consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard.") (citations omitted).

*Ernie Haire Ford, Inc. v. Universal Underwriters Insurance Co.*, 541 F. Supp. 2d 1295, 1297-98 (M.D. Fla. 2008) (alteration in original). *See also American Bankers*

*Insurance Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005) ("This court reviews the district court's disposition of cross-motions for summary judgment *de novo*, applying the same legal standards used by the district court, viewing the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolving all reasonable doubts about the facts in favor of the non-moving party.").

## II. SUMMARY OF FACTS

The I.A.M. National Pension Fund ("the Fund") is a "multiemployer defined benefit, employee benefit plan" within the meaning of ERISA.[4]  The Fund is operated

---

[4] Doc. no. 39-1 (Declaration of Eunice Dietz) ¶ 4.  The ERISA statute defines an "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."  29 U.S.C. § 1002(3).  An "employee pension benefit plan" is defined as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program–
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).  A "defined benefit plan" is "a pension plan other than an individual account plan."  29 U.S.C. § 1002(35).  A "multiemployer plan" is

> a plan–

4

by a group of Trustees, who adopted a Trust Agreement to set forth the "terms and conditions under which the Fund is to be continued and administered."[5]   The Trust Agreement states that the "exclusive purpose" of the Fund is "providing pension benefits to employees and their beneficiaries under the terms of the Plan . . . ."[6]   The "Plan" is "the program or programs of pension benefits established by the Trustees pursuant to" the Trust Agreement.[7]   "Employees" are "all persons within bargaining units represented by a Local or District Lodge of the I.A.M., or by the I.A.M., who are employed by Employers, and who are covered by this Pension Fund pursuant to a Collective Bargaining Agreement."[8]   The "I.A.M." is the "International Association of Machinists and Aerospace Workers, AFL-CIO."[9]   An "Employer" is

> any Employer (including employer associations) who now or hereafter

---

> (i) to which more than one employer is required to contribute,
>
> (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and
>
> (iii) which satisfies such other requirements as the Secretary may prescribe by regulation.

29 U.S.C. § 1002(37).

[5] Doc. no. 39-2 (Amended and Restated Trust Agreement for the I.A.M. National Pension Fund), at 1 ("WHEREAS" clauses) and Art. III ("Trustees").

[6] *Id.* at Art. III, Sec. 2 ("General Purposes").

[7] *Id.* at Art. I, Sec. 8 ("Plan").

[8] *Id.* at Art. I, Sec. 2(a) ("Employees").

[9] *Id.* at Art. I, Sec. 3 ("I.A.M. or International Union").

has a Collective Bargaining Agreement with a Local or District Lodge of the I.A.M. or with the I.A.M., or has another written agreement, requiring periodic contributions to the Pension Fund continued by [the] Trust Agreement, and who adopts and agrees to be bound by the terms and provisions of this Agreement and any amendments and modifications thereof, and who is accepted as an Employer by the Trustees.

Doc. no. 39-2 (Amended and Restated Trust Agreement for the I.A.M. National Pension Fund), at Art. I, Sec. 1 ("Employer") (alteration supplied). Pursuant to the Trust Agreement:

> The Trustees have the full and exclusive discretionary authority to determine all questions of coverage and eligibility, methods of providing benefits and all other related matters. The Trustees have full discretionary power to interpret the provisions of this Restated Agreement and Declaration of Trust, as well as the provisions of any Plan or Plans of Benefits and any rules, regulations, or procedures created pursuant to this Restated Trust Agreement. The terms used herein and any construction or interpretation adopted by the Trustees in the exercise of this discretionary authority shall be binding upon the International Union, the Local and District Lodges, the Employers and the Employees and their families, dependents, beneficiaries and legal representatives.

*Id.* at Art. IV, Sec. 7 ("Construction of Agreement"). The Trust Agreement also states the following with regard to an employer's obligation to contribute to the Fund:

> In order to effectuate the purpose hereof, each Employer shall contribute to the Fund the amount required by the Collective Bargaining Agreement between the Local or District Lodge of the International Association of Machinists and Aerospace Workers, or the I.A.M., and the Employer and by any other agreement or law requiring contributions to the Fund with respect to Employees described in Sections 2(b) and

> 2(c) of Article I. *The rate of contribution shall at all times be governed by the aforesaid Collective Bargaining Agreement then in force and effect and by any other such agreement to the extent that such contribution rate is consistent with the rules adopted by the Trustees and this Restated Trust Agreement.*

*Id.* at Art. V, Sec. 1 ("Rate of Contributions") (emphasis supplied). If an employer fails to make the required contributions, it "shall be liable for liquidated damages of twenty percent (20%) of the amount due and simple interest shall be paid on all amounts due at the rate of eighteen percent (18%) per annum from the date of the delinquency until the date payment is received."[10]

An employer becomes a party to the Trust Agreement when it executes a copy of it, or of any part of it, or by otherwise agreeing to be bound by it. Such an employer thereby

> agrees to participate in the Fund, agrees to be bound by [the] Trust Agreement, *agrees to be bound by any Standard Contract Language adopted by the Trustees*, irrevocably designates as its representative on the Board of Trustees the persons serving from time to time as Employer Trustees, and agrees to be bound by the action of the Trustees pursuant to this Restated Trust Agreement.

*Id.* at Art. V, Sec. 4 ("Default in Payment"). "Standard Contract Language" is defined as

> specified language which the Trustees may require each Contributing Employer to agree to either as part of the Collective Bargaining Agreement or as part of a separate agreement. No oral or written

---

[10] *Id.* at Art. V, Sec. 4 ("Default in Payment").

modification of the Standard Contract Language shall be binding on the Trustees. *Provisions in a Collective Bargaining Agreement or other agreement which are contrary to the terms of this Trust or the Standard Contract Language are void and shall not be binding on the Trustees.* No grievance procedure, settlement, or arbitration decision under a Collective Bargaining Agreement shall be binding on the Trustees.

*Id.* at Art. X, Sec. 2(c) ("Written Instruments") (emphasis supplied). Additionally, "[t]he continued submission of contributions to the Fund by an Employer constitutes acceptance of the terms of [the] Trust Agreement and of the Standard Contract Language despite any provisions in a Collective Bargaining Agreement to the contrary."[11]

The Trustees also adopted a document entitled the "I.A.M. National Pension Fund National Pension Plan" ("the Plan"). The Plan was established "to provide retirement benefits for employees who are represented for the purpose of collective bargaining by a Lodge chartered by the International Association of Machinists and Aerospace Workers."[12] An employee is covered under the Plan if he has secured "employment in a *job classification* for which employer contributions are required to this Plan by a Collective Bargaining Agreement between a Contributing Employer and a Lodge."[13] A "Contributing Employer" is any "employer which is accepted for

---

[11] Doc. no. 39-2 (Amended and Restated Trust Agreement for the I.A.M. National Pension Fund), at Art. X, Sec. 2(d) ("Written Instruments") (alterations supplied).

[12] Doc. no. 39-4 (I.A.M. National Pension Fund National Pension Plan), at Art. II, Sec. 2.1 ("General").

[13] *Id.* at Art. I, Sec. 1.6(a) (emphasis supplied).

participation in the Fund by the Trustees in accordance with the Trustees' procedures provided in Article II and which then makes contributions to the Fund as required by the Trustees."[14]   Even so, an employer will only be considered a "Contributing Employer" "with respect to those *job classifications* and places of business which are covered by the first Collective Bargaining Agreement or other written Agreement approved by the Trustees which provides for contributions to" the Fund.[15]

According to the Plan, the Trustees have discretion to accept new employers into the Fund as Contributing Employers.

> The acceptance of an employer as a new Contributing Employer and the continued participation of that employer as a Contributing Employer are conditioned upon the employer executing and remaining signatory to Standard Contract Language, an acceptance of the Trust and Plan and all amendments, and such other documents as the Trustees may require.  The Standard Contract Language is specified language which the Trustees require each Contributing Employer to agree to either as part of the Collective Bargaining Agreement or as part of a separate agreement.  *No oral or written modification of the Standard Contract Language shall be binding upon the Trustees.  Provisions in a Collective Bargaining Agreement or other Agreement between a Lodge and a Contributing Employer which are contrary to the terms of the Trust or Plan are void and shall not be binding on the Trustees.*

*Id.* at Art. II, Sec. 2.2 ("Acceptance of New Employers and Basis for Continued Participation of Employers") (emphasis supplied).

---

[14] *Id.* at Art. I, Sec. 1.3 ("Employer" or "Contributing Employer").

[15] *Id.* (emphasis supplied).

Defendant, Listerhill Total Maintenance Center, LLC ("Listerhill"), is an employer that contributes to the Fund on behalf of its employees. Listerhill entered into a Collective Bargaining Agreement with Lodge No. 1189 of the International Association of Machinists and Aerospace Workers, District 75 ("the Union") on March 6, 2006, covering the time period of February 11, 2006 through February 10, 2009 ("the 2006 Agreement").[16]  The 2006 Agreement contained the following provision addressing Pension and Insurance Plans: "There is attached hereto as an exhibit a Pension Plan that shall become effective as provided herein.  The parties agree that this Pension Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."[17]  However, neither party has provided a copy of the Pension Plan that was attached to the 2006 Agreement.  Thus, the only information in the current record about the contributions that Listerhill was required to make to the Fund under the 2006 Agreement can be found in the various declarations submitted by the parties.

First, the Fund submitted a declaration from Eunice Dietz, its Manager of Education and Employer Services, dated December 7, 2015, and stating:

> Prior to signing the 2009 [Collective Bargaining Agreement], the Standard Contract Language forms set forth [Listerhill's] contribution

---

[16] *See* doc. no. 46-5 (2006 Agreement).

[17] *Id.* at Art. XIX, Sec. 1(a).

rates based on the different job classifications of its employees as listed in the prior collective bargaining agreement between the Union and [Listerhill] effective February 11, 2006 through February 10, 2009. [Listerhill] has been required to pay contributions pursuant to the Fund's Standard Contract Language since they became a Contributing Employer on March 31, 2003.

> Prior to signing the 2009 [Collective Bargaining Agreement], [Listerhill] was required to pay contributions on behalf of all employees classified as "Machinist" or "Mechanic" at the rate of $5.50 per hour. The Fund assigned the code "L03B" to all [Listerhill] job classifications receiving $5.50 per hour in pension contributions.

> Prior to signing the 2009 [Collective Bargaining Agreement], [Listerhill] was required to pay contributions on behalf of all employees classified as "Helpers" at the rate of $4.55 per hour. The Fund assigned the code "L04B" to all TMC job classifications receiving $4.55 per hour in pension contributions.

> Prior to signing the 2009 [Collective Bargaining Agreement], [Listerhill] was required to pay contributions on behalf of all employees classified as "Mechanical Tech Machinist," "Mechanical Tech Machinist Helper," "Mech Tech Gas & Diesel Mechanic," or "Mech Tech Gas & Diesel Helper" at the rate of $0.10 per hour. The Fund assigned the code "L22B" to all TMC job classifications receiving $0.10 per hour in pension contributions.

Doc. no. 39-1 (Declaration of Eunice Dietz), at ¶ 1, 14-17 (alterations supplied, paragraph numbers omitted).

Listerhill then submitted the declaration of David Duford, its Labor Relations Manager, dated January 27, 2016. Duford stated:

> For the term of the 2006-2009 collective bargaining agreement, [Listerhill] and the IAM agreed to freeze the hourly pension

11

> contributions in effect as of February 10, 2006 for all bargaining unit personnel on the payroll as of that date, regardless of their respective job classifications.   As of February 10, 2006, [Listerhill] contributed $5.50/hour worked to the Fund [for] a small group of employees hired before February 10, 2006, and it contributed $4.55/hour worked for a different small group of employees hired before February 10, 2006.
>
> But, for all employees hired by [Listerhill] on or after February 13, 2006, the . . . 2006-2009 collective bargaining agreement required [Listerhill] to contribute to the Fund $0.10/hour worked per employee regardless of the job classification the person worked.

Doc. no. 46-1 (Declaration of David Duford), at ¶¶ 7-8 (alterations and ellipsis supplied, paragraph numbers omitted).  Presumably, the "small group of employees" who received a $5.50/hour contribution under the 2006 Agreement are the "Machinists" and "Mechanics" that Dietz identified as being assigned the code "L03B," and the "small group of employees" who received a $4.55/hour contribution were the "Helpers" who were assigned the code "L04B."   The remainder of employees, who received a $0.10/hour contribution, presumably are the ones Dietz identified as being assigned the code "L22B" (*i.e.,* "Mechanical Tech Machinists," "Mechanical Tech Machinist Helpers," "Mech Tech Gas & Diesel Mechanics," and "Mech Tech Gas & Diesel Helpers").

The Fund submitted a "Supplemental Declaration" from Eunice Dietz, dated February 25, 2016, stating:

> Since Defendant [Listerhill] . . . began participating in the Fund

in 2003, its contribution obligation for each TMC employee corresponded to that employee's "job classification" under [Listerhill's] operative collective bargaining agreement.

[Listerhill's] contribution rates from January 1, 2004 through February 10, 2006 were determined based on the job classifications in the wage addendum of [Listerhill's] collective bargaining agreement during that time period.

Under the collective bargaining agreement between the Union and [Listerhill] effective February 11, 2006 through February 10, 2009 ("the 2006 CBA"), [*Listerhill*] *created job classifications based on its employees' dates of hire.*

During the operation of the 2006 CBA, [Listerhill] made contributions at the applicable rates for each "job classification" defined in the wage table of the 2006 CBA.[18]

As of January 1, 2008, [Listerhill's] contribution rates increased to $5.50 per hour on behalf of all employees classified as "Machinists" in the 2006 CBA and $4.55 per hour on behalf of all employees classified as "Machinist Helper," or "Gas & Diesel Mechanics Helper" in the 2006 CBA. Accordingly, as of January 1, 2008, [Listerhill] paid the Fund $5.50 per hour on behalf of all employees classified as "Machinists" in the 2006 CBA and $4.55 per hour on behalf of all employees classified as "Machinist Helper," or "Gas & Diesel Mechanics Helper" in the 2006 CBA.

The January 1, 2008 contribution rate increase only applied to job classifications covered under the L03B and L04B Standard Contract Language forms.[19]

---

[18] The court again notes that the record does not contain a copy of the wage table of the 2006 Agreement.

[19] There is nothing in the record that is identified as a "Standard Contract Language form" addressing these January 1, 2008 contribution rate increases. Instead, there is only what appears to be a memorandum on the Fund's letterhead, stating, "The pension contribution rates for Listerhill Total Maintenance increased to $5.50 per hour for Machinists (L03B) and $4.55 per hour for Helpers

[Listerhill] never paid a different contribution rate on behalf of employees within the same job classification during the course of the 2003 CBA or the 2006 CBA.

The Fund has never agreed to or allowed different contribution rates within the same job classification based on seniority.

The Fund's Standard Contract Language have [*sic*] always required that [Listerhill] make contributions based on job classification. The Fund's Standard Contract Language provides specific employer contribution rates for each job classification, thus implementing [Listerhill's] agreement in the CBA to participate in the Fund and be bound by the Trust Agreement.

Doc. no. 49-1, ECF 6-8 (Supplemental Declaration of Eunice Dietz), at ¶¶ 4-12 (alterations and emphasis supplied).  Thus, according to the supplemental declaration, while the $4.55 and $5.50 per hour rates Ms. Dietz identified in her original declaration did not become effective until Standard Contract Language forms were signed on January 1, 2008, those rates applied to job classifications that had been specified in the 2006 Agreement.  Importantly, the job classifications specified in the 2006 Agreement (including Machinists who were assigned the code L03B for

(L04B) effective 1-1-08," and signed by Gary Wills, Business Representative of the Union, and Sheila Duncan, Human Resources Manager for Listerhill.  Doc. no. 49-1, at ECF 33.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

administrative processing purposes, and Machinist Helpers and Gas & Diesel Mechanics Helpers, who were assigned the code L04B) were based upon employees' dates of hire.  Even so, no two employees *within* the same job classification ever received different contribution rates based on their varying levels of seniority.

Listerhill and the Union entered into the Collective Bargaining Agreement that directly applies to plaintiff's claims in this case on January 7, 2010, covering the time period of February 11, 2009 through December 10, 2013 ("the 2009 Agreement").[20] The 2009 Agreement states, in pertinent part:

> The I.A.M. Local Lodge 1189, District 75 and Listerhill Total Maintenance Center adopt and agree to be bound by, and hereby assent to, the Trust Agreement, dated May 1, 1960, as amended, creating the I.A.M. National Pension Fund and the Plan rules adopted by the Trustees of the I.A.M. National Pension Fund in establishing and administering the foregoing Plan pursuant to the said Trust Agreement, as currently in effect and as the Trust and Plan may be amended from time to time.

Doc. no. 39-3 (2009 Collective Bargaining Agreement), at Art. 31, Sec. 1. Additionally, the 2009 Agreement states the following with regard to Pension and Insurance Plans:

> The Company agrees to contribute a pension factor of $0.40 per hour paid as worked up to a maximum of 2080 hours per calendar year to the I.A.M. National Pension Fund on behalf of the employees represented by the Union who have a seniority date of 02/09/06 or greater, and who have completed their probationary period in

---

[20] Doc. no. 39-1 (Declaration of Eunice Dietz), at ¶ 7.

accordance [with] Article 5, Section 2.

    (a)    Employees with a seniority date of less than 02/09/06 will have their pension factor as of 02/10/09 frozen.

    (b)    There will be no further wage reallocations of any kind allowed to increase any employees' [*sic*] pension factor.

*Id.* at Art. 21, Sec. 1 (alterations supplied).

Thus, when the 2009 Agreement took effect, all the employees who had been receiving pension contributions of $4.55 per hour (*i.e.,* the "Helpers" assigned Employer Code L04B) and $5.50 per hour (*i.e.,* the "Machinists" and "Mechanics" assigned Employer Code L03B) under the 2006 Agreement and the Standard Contract Language forms continued to receive contributions at the same rates (*i.e.,* they had their pension factors "frozen").  It logically follows that all of those employees also had seniority dates earlier than February 9, 2006, because the L03B and L04B codes were only assigned to employees with seniority dates earlier than February 9, 2006. All other employees in all other job classifications *other than* L04B Helpers and L03B Machinists/Mechanics were assigned Employer Code L22B, and they began receiving a contribution rate of $0.40 per hour under the 2009 Agreement, which was an increase over the $0.10 rate they had previously received.

The 2009 Agreement also included a Wage Table listing the *rate of pay* (*i.e.,* the hourly wage) for employees in each of seventeen "job classifications." The Wage

Table did *not* address the *pension contribution rates* received by the employees in each job classification, and it did not list the Employer Codes administratively assigned to each classification for purposes of calculating pension contribution rates. The classifications listed in the Wage Table were:   Team Leader; Machinist; Machinist-in-Training I; Machinist-in-Training II; Machinist-in-Training III; Machinist-in-Training IV; Mechanic; Mechanic-in-Training I; Mechanic-in-Training II; Mechanic-in-Training III; Mechanic-in-Training IV; Multi-craft I; Multi-craft II; Multi-craft III; Trainee; Helper I; and Helper II.[21]   The 2009 Wage Table did not include the job classifications of "Mechanical Tech Machinist," "Mechanical Tech Machinist Helper," "Mech Tech Gas & Diesel Mechanic," and "Mech Tech Gas & Diesel Helper" that had been specified in the 2006 Agreement and the January 1, 2008 Standard Contract Language forms.

The Fund delivered a series of correspondence to Listerhill and the Union after the 2009 Agreement was executed, for the apparent purpose of clarifying the correct contribution rates for various groups of employees, and the correct Employer Codes to administratively assign each group in the Fund's recordkeeping system.   First, Eunice Dietz sent a letter to Shelia A. Duncan, Listerhill's Human Resources Manager, and Gary D. Wills, the Union's Business Representative, on December 10,

---

[21] Doc. no. 39-3 (2009 Collective Bargaining Agreement), at Art. 20 (Wage Table).

2010. Ms. Dietz noted that three job classifications that had previously been included in the 2006 Agreement — *i.e.,* Mechanical Tech Machinist, Mechanical Tech Machinist Helper, and Mechanical Tech Gas & Diesel Mechanic — were no longer listed in the 2009 Agreement.[22] She inquired whether the employees previously listed in those job classifications had been reclassified.[23] She also referenced Employer Codes L03B, L04B, and L22B in the subject line of her letter, but that reference is inexplicable, because it is clear from remainder of the record that the positions of Mechanical Tech Machinist, Mechanical Tech Machinist Helper, and Mechanical Tech Gas & Diesel Mechanic *all* had been assigned the Employer Code L22B in the 2006 Agreement.[24] The Fund did not receive a response to Ms. Dietz's December 10, 2010 letter.[25]

Ms. Dietz sent a second letter to Gary Wills and Matthew Varble, Listerhill's Labor Relations Manager, on November 18, 2011.[26] The letter referenced Employer

_____

[22] The court notes that there was also a fourth job classification — Mechanical Tech Gas & Diesel Helper — that had been listed in the 2006 Agreement and 2008 Standard Contract Language forms, but was omitted from the Wage Table in the 2009 Agreement.

[23] Doc. no. 39-5 (December 10, 2010 letter).

[24] *Id.* at 1 (reference line).

[25] Doc. no. 39-1 (Declaration of Eunice Dietz), at ¶ 21.

[26] Doc. no. 39-6 (November 18, 2011 Letter). Like the December 10, 2010 letter, the November 18, 2011 letter was addressed to Gary D. Wills. It also was addressed to Matt Varble, as Listerhill's "Human Resources Manager." *Id.* at 1. In the salutation line of the November 18 letter, however, Ms. Dietz states: "Dear Mr. *David* and Mr. Wills." *Id.* (emphasis supplied). The reference to Mr. Varble as Human Resources Manager appears to have been a mistake, because Varble testified in his deposition that he was Listerhill's Labor Relations Manager, not the Human

Codes L03B, L04B, and L22B, and stated, in pertinent part:

> We have previously received the renewal Collective Bargaining Agreement for the above named Company (Listerhill) effective February 11, 2009 through December 10, 2013.

> As you have been advised, Article 21 of the renewal agreement does not incorporate the Fund's Standard Contract Language . . . . Additionally, the Contribution Rates for the three groups of employees [presumably, the groups covered by the Employer Codes listed in the reference line of the letter, *i.e.,* L03B, L04B, and L22B] are not specified in this Article and it appears that the Contribution Rates are based on seniority.

> Be advised that Contribution Rates may be based on job classification but not on seniority. The Contribution Rates under the prior collective bargaining agreement were as follows:

> | | |
> |---|---|
> | L03B (Machinists/ Mechanics): | $5.50 per hour |
> | L04B (Helpers): | $4.55 per hour |
> | L22B (Mechanical Technicians): | $0.10 per hour. |

> The Mechanical Tech job classifications are no longer listed in the renewal agreement. Were the employees previously in these job classifications reclassified into different job classifications? Further, the renewal agreement includes the new job classifications of Team Leader, Multi-craft and Trainee. Please advise if these job classifications replace the Mechanical Tech job classifications.

> Employees who were reclassified to job classifications under the Machinists/Mechanics job classifications must have contributions made

---

Resources Manager. *See* doc. no. 46-3 (Deposition of Matthew Varble), at 9-10. It is not clear who the "Mr. David" referenced in the salutation might have been, but it might have referred to David Duford, who served as Listerhill's Labor Relations Manager until July of 2011. *See* doc. no. 46-1 (Declaration of David Duford), at ¶ 2. Although it cannot be determined with complete certainty from the current record, it seems most likely that Ms. Dietz intended to address the letter to Matthew Varble as the Labor Relations Manager.

> under Employer Code L03B at the Contribution Rate of $5.50 per hour. Employees who were reclassified to job classifications under the Helpers job classifications must have contributions made under Employer Code L04B at the Contribution Rate of $4.55 per hour.
>
> In order to verify the applicable Employer Code for each employee, please provide a list of all employees and their job classifications as of February 11, 2009.
>
> Also, we have enclosed three copies of Standard Contract Language for each Employer Code for signature by both parties . . . . The forms have been completed with the same options chosen in the prior agreement. Kindly forward a fully executed copy of each form to the Fund Office as soon as possible so that we may update our records.[27]

Doc. no. 39-6 (November 18, 2011 letter), at 1-2. There is no indication in the record of whether Listerhill or the Union responded to the November 18 letter.

Ms. Dietz sent a third letter on December 19, 2011, addressed to Bill Miossi, Listerhill's attorney. The letter again referenced Employer Codes L03B, L04B, and L22B. Ms. Dietz stated that she was responding to an e-mail that Mr. Miossi had sent to Tim Holt (who presumably is an employee of the Fund but who is not otherwise identified) on December 14.[28] She also said:

> You stated that the Fund unilaterally and dramatically changed the terms and pension contribution rates that were settled in the collective bargaining agreement in effect for over two years. This statement is untrue.

---

[27] Doc. no. 39-6 (November 18, 2011 letter), at 1-2.

[28] There is not a copy of the e-mail from Mr. Miossi to Mr. Holt in the record.

Pension contribution rates can not be based on seniority dates or dates of hire.   However, contribution rates may be based on job classifications.

Effective February 11, 2006 the job classifications of Mechanical Tech Machinists, Mechanical Tech Machinist Helper and Mechanical Tech Gas & Diesel Mechanic were added to the collective bargaining agreement in effect at Listerhill Total Maintenance from February 11, 2006 through February 10, 2009.   The pension contribution rate for employees in these newly added job classifications was $0.10 per hour.

Effective February 11, 2009, the Mechanical Tech job classifications are no longer listed in the renewal agreement.[29] However, the renewal agreement includes the new job classifications of Team Leader, Multi-craft and Trainee.   The Fund is attempting to determine if these job classifications replace the Mechanical Tech job classifications from the prior agreement.

If employees previously classified in Mechanical Tech job classifications have been reclassified to job classifications under either the Machinists/Mechanics job classifications or the Helper job classifications, then the company is required to make pension contributions based on the negotiated contribution rates for those job classifications.

In order to verify the appropriate contribution rate for each employee, we have requested a list of all employees and their job classifications as of February 11, 2009.   To date the company has not provided this information.

Doc. no. 39-7 (December 19, 2011 letter), at 1-2.   The Fund did not receive a response to the December 19, 2011 letter.[30]

---

[29] The court notes that the "Mechanical Tech Gas & Diesel Helper" position also had been included in the 2006 Agreement but omitted from the 2009 Agreement.

[30] Doc. no. 39-1 (Declaration of Eunice Dietz), at ¶ 24.

Joseph P. Martocci, Jr., the Manager of Legal Services for the Fund, sent another letter to Mr. Miossi on March 28, 2012, again referencing Employer Codes L03B, L04B, and L22B. Mr. Martocci noted that the Fund had not received executed Standard Contract Language Agreements dictating the appropriate contribution rates for the new job classifications set forth for the first time in the 2009 Agreement. The Fund had, however, received "an undated seniority listing prepared by the employer, which breaks down, by job classification, the covered employees at Listerhill,"[31] and it attempted to determine appropriate pension contribution rates based upon that listing. The listing had grouped employees under four titles: Machinists, Multi-Craft, Machinist & Mechanic Helpers, and Mechanics.[32] Based upon the Fund's internal research, it determined that "the applicable employer codes, which result in the appropriate contribution rates for this listing is as follows [*sic*]: L03B – Machinists; and Mechanics; L04B – Machinist & Mechanic Helpers; and L22B – Multi-Craft."[33] Mr. Martocci enclosed Standard Contract Language forms, specifying a contribution rate for each of those Employer Codes, and asked that the forms be executed "[i]n order to permit the Fund to properly credit the participants and provide for the

---

[31] Doc. no. 39-8 (March 28, 2012 letter), at 2.

[32] *See id.* and attachment.

[33] *Id.*

appropriate submission of pension contributions by the employer."[34]   He also

included a copy of the employee listing from which he had derived the four categories

of employees.

Listerhill and the Union entered into a Side Letter Agreement on April 23,

2012, for the stated purpose of "facilitat[ing] the administration of the contributions

that [Listerhill] has made on behalf of [its] employees represented by the IAM since

2006 through the present to the IAM National Pension Fund under the terms of the

parties' 2006-2008 Labor Agreement, as well as the parties' current Labor

Agreement."[35]  The Side Letter Agreement stated:

> The IAM National Pension Fund permits different contribution
> rates for different employee groups as the parties have agreed in their
> current Labor Agreement, but the different contribution rates must be
> based on certain job classifications, as opposed to seniority dates of the
> affected employees.  The IAM Pension Fund Administrator has written
> the parties and requested that we execute certain "Standard Contract
> Language" forms that are attached to this Side Letter as exhibits.

> The parties agree for purposes of complying with the IAM
> National Pension Plan administration requirements and method for
> accounting for different contribution rates for different groups of
> employees to 1. code those employees for whom a $0.40/hour pension
> factor is contributed pursuant to Article 21 of our current Labor
> Agreement as "L22B Multi-Craft"; 2. code those employees for whom
> a $4.55/hour pension factor is contributed pursuant to Article 21 of our

---

[34] *Id.* (alteration supplied).

[35] Doc. no. 39-9 (Side Letter Agreement), at 1 (alterations supplied).  The Side Letter
Agreement was signed by Matt Varble on behalf of Listerhill and Gary Wills on behalf of the Union.
*See id.*

current Labor Agreement as "L04B Machinist & Mechanical Helper"; and 3. code those employees for whom a $5.50/hour pension factor is contributed pursuant to Article 21 of our current Labor Agreement as "L03B Machinist Mechanic." The parties will jointly prepare a roster of bargaining unit employees, identified by the IAM National Pension Plan codes stated in this letter, and submit it along with the "Standard Contract Language" forms prepared by the IAM Pension Plan administrator.

Except as expressly stated herein, no terms of the parties' Labor Agreement is amended [*sic*], including but not limited to Articles 20 and 21.

Doc. no. 39-9 (Side Letter Agreement), at 1 (alterations supplied).

The Union executed three of the Fund's Standard Contract Language forms on April 25, 2012, and Listerhill executed the same forms the following day, April 26, 2012.[36] The forms were identical, except that each one stated a different Employer Code and position, and each specified a pension contribution rate for the designated position. The form bearing the Employer Code and position "L22B Multi-Craft" stated: "The Employer shall contribute to the I.A.M. National Pension Fund, National Pension Plan for each [hour] thereof . . . for which employees in all job classifications covered by this Agreement are entitled to receive pay under this Agreement . . . as follows: $.40 per hour effective February 11, 2009."[37] The form bearing Employer Code and positoin "L03B Machinist Mechanic" contained the same language, but

---

[36] *See* doc. no. 39-10 (Standard Contract Language Forms). Gary Wills signed on behalf of the Union, and Matt Varble signed on behalf of Listerhill. *See id.* at ECF 3, ECF 5, and ECF 7.

[37] *Id.* at ECF 2 (alteration and ellipses supplied).

stated an hourly rate of $5.50 per hour.[38]   The form bearing Employer Code "L04B

Machinist & Mechanical Helper" stated an hourly rate of $4.55 per hour.[39]   Each of

the forms also contained the following pertinent language:

> D.    The I.A.M. Lodge and Employer adopt and agree to be bound by, and hereby assent to, the Trust Agreement, dated May 1, 1960, as amended, creating the I.A.M. National Pension Fund and the Plan rules adopted by the Trustees of the I.A.M. National Pension Fund in establishing and administering the foregoing Plan pursuant to the said Trust Agreement, as currently in effect and as the Trust and Plan may be amended from time to time.
>
> E.    The parties acknowledge that the Trustees of the I.A.M. National Pension Fund may terminate the participation of the employees and the Employer in the Plan if the successor collective bargaining agreement fails to renew the provisions of this pension Article or reduces the Contribution Rate.   The parties may increase the Contribution Rate and/or add job classifications or categories of hours for which contributions are payable.
>
> F.    This Article contains the entire agreement between the parties regarding pensions and retirement under this Plan and any contrary provisions in this Agreement shall be void.   No oral or written modification of this Agreement shall be binding upon the Trustees of the I.A.M. National Pension Fund.   No grievance procedure, settlement or arbitration decision with respect to the obligation to contribute shall be binding upon the Trustees of the said Pension Fund.

*See* doc. no. 39-10 (Standard Contract Language Forms), at CF 2, ECF 4, and ECF

6.

---

[38] *Id.* at ECF 4.

[39] *Id.* at ECF 6.

Gary Wills sent the Fund an e-mail on April 26, 2012, stating: "Attached is the seniority list I received from [Listerhill] per my information request and the signed [Side Letter Agreement]."[40]  Attached to the e-mail was a series of charts classifying all employees as either a "Machinist & Mechanic in Training," "Multi-Craft," or "Machinist."  Each chart contained each employee's date of hire, and specified whether each employee worked the 7:00a.m.-3:00 p.m. shift, the 3:00 p.m.-11:00 p.m. shift, or the 11:00 p.m.-7:00 a.m. shift.[41]  The charts did not, however, contain any Employer Codes.  According to the charts, there were six employees classified as "Machinists & Mechanics in Training," fifty-five employees classified as "Multi-Craft," and forty-six employees classified as "Machinists."[42]  The Fund refers to this group of charts as the "Side Letter Roster."  The court notes that the job classifications included on the Side Letter Roster do not match up to the ones listed on the Standard Contract Language forms and the Side Letter Agreement.  While the Side Letter Roster listed "Multi-Craft," "Machinist," and "Machinists & Mechanics in Training," both the Standard Contract Language forms and the Side Letter Agreement listed "Multi-Craft," "Machinist Mechanic," and "Machinist & Mechanical Helper."

---

[40] Doc. no. 39-11 (April 26, 2012 email) (alterations supplied).

[41] *Id.* at ECF 3-6 (Charts).

[42] *Id.*

John Blazer, Listerhill's corporate representative, testified that the charts comprising the "Side Letter Roster" were sent in error and were "inaccurate."[43] According to Blazer, the charts were a "list of work schedules and job classifications," but the job classifications listed reflected the *work area* to which each employee was assigned, not the pension contribution factor associated with the employee.[44]  Blazer testified that each employee listed on the "Side Letter Roster"

> could be in any of the classifications listed in the wage table of the 2009 to '13 Contract in regards to their actual rate of pay.  In regards to their pension contribution rate, it would be depend [*sic*] on their date of hire with the company in accordance with the previous two contracts.

Doc. no. 39-18 (Deposition of John Blazer), at 67.

Matt Varble characterized Listerhill's transmission of the "Side Letter Roster" as a "clerical error,"[45] and the Side Letter Roster itself as "a shift schedule roster . . . not an actual seniority list."[46]   According to Varble, only a "handful of people [should] have been getting the larger pension contributions" (*i.e.,* $4.55 and $5.50 per hour), and the Roster did not provide sufficient information to accurately identify those people.[47]  Instead, Varble thought that

---

[43] Doc. no. 39-18 (Deposition of John Blazer), at 66.

[44] *Id.* at 66-67.

[45] Doc. no. 46-3 (Deposition of Matthew J. Varble), at 23-24.

[46] *Id.* at 55.

[47] *Id.* at 24-25 (alteration supplied).

> what should have been sent is a roster showing employees and their hire dates and their associated job code so that it was an accurate representation of what [Listerhill and the Union] agreed to and discussed as defined in Article 21 of the labor agreement and so that accounting would have everything accurate.

Doc. no. 46-3 (Deposition of Matthew J. Varble), at 55-56. Moreover, Varble believed that the Side Letter Agreement did not change the portion of Article 21 of the 2009 Collective Bargaining Agreement that assigned a pension contribution rate of $0.40 per hour for every employee hired after February 9, 2006. Instead, Varble thought the purpose of the Side Letter Agreement was "providing codes to help with the administration" of the various pension rates.[48]

The Fund notified Listerhill in a letter dated December 20, 2012, that it had reviewed Listerhill's "contribution history" to the Fund pursuant to the Side Letter Agreement and the Side Letter Roster. The Fund stated:

> In accordance with the seniority lists provided 6 employees previously reported under Employer Code L22B should have been reported under Employer Code L04B and 41 employees previously reported under Employer Code L22B should have been reported under Employer Code L03B, retroactive to February 1, 2009, resulting in an underpayment in contributions to the Fund.

Doc. no. 39-12 (December 20, 2012 letter), at 1. That was because the Fund believed that, in the Side Letter Agreement, the

bargaining parties agreed that the $0.40 per hour Contribution Rate

---

[48] *Id.* at 56-57.

would apply to employees classified as Multi-Craft (L22B); the $4.55 per hour Contribution Rate would apply to employees classified as Machinist & Mechanical Helper (L04B) and the $5.50 per hour Contribution Rate would apply to employees classified as Machinist Mechanic (L03B).

*Id.* Listerhill never paid the Fund the delinquent amounts identified in the December 20, 2012 letter, and it continued to remit payment at the lower rate of $0.40 per hour for all employees hired after February 9, 2006.[49]

Listerhill's attorney responded to the Fund's December 20, 2012 letter on January 11, 2013, stating:

> [Listerhill] has properly and timely made all contributions to the Fund, and the contention that there is an underpayment of $1,502,293.30, or any other amount[,] is incorrect, and audits conducted by the Fund on April 19, 2007, July 9, 2008 and September 20, 2010, have so verified. It appears that either the Fund was provided with inaccurate census information or misinterpreted that information in concluding that there has been an underpayment. The attached spreadsheet, which is the format with which the Company monthly reports its contributions to the Fund, identifies the contributions per Employer Code that [Listerhill] is obligated to make and has made correctly. During the period in question, there have only been 5 employees under Employer Code L03B, one under Code L02B [*sic:* L04B] (who retired several years ago) and all the rest are under Code L22B. On behalf of [Listerhill], I apologize for any confusion that resulted from the mistaken information that was apparently provided.

Doc. no. 46-11 (January 11, 2013 letter) (alterations supplied). The attached charts referenced by Listerhill's attorney listed the name of each employee who was

---

[49] Doc. no. 39-1 (Declaration of Eunice Dietz), at ¶ 32.

receiving contributions at the rate of $5.50 under Employer Code L03B, and each employee who was receiving contributions at the rate of $0.40 under Employer Code L22B.[50]   The charts did not, however, list the job titles associated with those Employer Codes, and they only disclosed the contributions that had been made on behalf of each employee for a limited period from September 30, 2012 to October 31, 2012.  It therefore appears that the charts were offered for the purpose of illustrating the method by which Listerhill assigned Employer Codes to various employees, not for the purpose of providing a complete calculation of all the amounts Listerhill had paid on behalf of its employees during the term of the 2009 Agreement.

Listerhill and the Union entered into a new collective bargaining agreement on December 6, 2013, effective from December 10, 2013 to December 10, 2018 ("the 2013 Agreement").   The 2013 Agreement eliminated Listerhill's obligation to contribute to the Fund after December 10, 2013.[51]

### III. DISCUSSION

Section 515 of ERISA states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent

---

[50] No chart was provided for employees listed under Employer Code L04B, presumably because, as explained by Listerhill's attorney in his January 11, 2003 letter, the only employee listed under that code had retired.

[51] Doc. no. 39-1 (Declaration of Eunice Dietz), at ¶ 33.

with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C.A. § 1145.  Additionally, Section 502 states, in pertinent part, that:

>     (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan –
>
>     (A) the unpaid contributions,
>
>     (B) interest on the unpaid contributions,
>
>     (C) an amount equal to the greater of–
>
> >     (i) interest on the unpaid contributions, or
> >
> >     (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>
>     (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>
>     (E) such other legal or equitable relief as the court deems appropriate.
>
>     For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

29 U.S.C. § 1132(g)(2).  The United States Supreme Court has instructed lower courts

to

interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy. *See Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456-457, 77 S. Ct. 912, 1 L. Ed. 2d 972 (1957). "In this endeavor, as with any other contract, the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010) (internal quotation marks omitted). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (Williston) (internal quotation marks omitted).

*M & G Polymers USA, LLC v. Tackett*, – U.S. –, 135 S. Ct. 926, 933 (2015). If there is an ambiguity in the contract, however,

the Court should be guided by the following principles. The Court derives the intent of the parties from the contract as a whole. *Ex parte University of South Alabama*, 812 So. 2d 341 (Ala. 2001); *Land Title Co. of Alabama v. State ex rel. Porter*, 292 Ala. 691, 299 So. 2d 289 (1974). The relations of the parties, the subject matter of the contract, and the object to be accomplished may be looked to in construing the contract to ascertain the intention of the parties. *Pacific Ins. Co. v. Wilbanks*, 283 Ala. 1, 214 So. 2d 279 (1968); *City of Birmingham v. I.E. Morris & Assocs.*, 256 Ala. 273, 54 So. 2d 555 (1951); *Merchants' Nat'l Bank of Mobile v. Hubbard*, 220 Ala. 372, 125 So. 335 (1929).

*FabArc Steel Supply, Inc. v. Composite Construction Systems, Inc.*, 914 So. 2d 344, 359 (Ala. 2005). Moreover, when ambiguities arise, summary judgment generally is inappropriate. As the Alabama Supreme Court has stated:

Because ambiguity remains, a summary judgment as to the meaning and proper application of the allegation provision to the facts of this case was improper:

> "[I]f the trial court finds the contract to be ambiguous, it 'must employ established rules of contract construction to resolve the ambiguity.' If the application of such rules is not sufficient to resolve the ambiguity, factual issues arise:
>
>> "'If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.'
>
> "Where factual issues arise, the resolution of the ambiguity becomes a task for the jury."
>
> *Alfa Life Ins. Corp. v. Johnson*, 822 So. 2d 400, 404-05 (Ala. 2001) (citations omitted). *See also Tucker v. Cullman–Jefferson Counties Gas Dist.*, 864 So. 2d 317 (Ala. 2003); *Ex parte Mountain Heating & Cooling, Inc.*, 867 So. 2d 1112 (Ala. 2003); *Ex parte Harris*, 837 So. 2d 283 (Ala. 2002); and *Ex parte Conaway*, 767 So. 2d 1117 (Ala. 2000). "Ambiguity in a contract precludes the trial court from entering a summary judgment" in an action for breach of contract. *Whitetail Dev. Corp. v. Nickelson*, 689 So.2d 865, 867 (Ala. Civ. App. 1996).

*FabArc Steel Supply, Inc.*, 914 So. 2d at 361 (alteration in original).

The parties in this case have spent most of the pages in their summary judgment briefs arguing about which document controls Listerhill's obligation to make contributions to the Fund.  The Fund asserts that the governing documents are the Standard Contract Language forms executed by the Union on April 25, 2012, and by Listerhill on April 26, 2012.  According to Listerhill, however, the governing documents are the 2009 Agreement (and, specifically, Article 21 thereof) and the

April 23, 2012 Side Letter Agreement.  That is not a dispute that needs to be resolved, because the Standard Contract Language forms, the 2009 Agreement, and the 2012 Side Letter Agreement all impose the same contribution requirements.[52]

Article 21 of the 2009 Agreement required Listerhill to contribute $0.40 per hour on behalf of all employees, except that "[e]mployees with a seniority date of less than 02/09/06 will have their pension factor as of 02/10/09 frozen."[53] The Fund repeatedly asserts that this provision must be avoided because it created a contribution obligation for each employee based upon the employee's *seniority*, not upon the employee's *job classification*, and the Fund does not permit contribution obligations to be assigned based upon seniority.  For purposes of addressing that argument, the court will set aside the fact that, as Listerhill has pointed out, there is no evidence of any rule in the Trust Agreement or any other document prohibiting

---

[52] Even though it is not necessary to decide which document or documents control, the court notes that the decision would be an easy one.  The Trust Agreement and the Plan both require participating employers to be bound by any Standard Contract Language adopted by the Trustees. *See* doc. no. 39-2 (Amended and Restated Trust Agreement for the I.A.M. National Pension Fund), at Art. X, Sec. 2(a) ("Written Instruments"); doc. no. 39-4 (I.A.M. National Pension Fund National Pension Plan), at Art. II, Sec. 2.2 ("Acceptance of New Employers and Basis for Continued Participation of Employers").  The Trust Agreement and the Plan also both avoid any provision of a Collective Bargaining Agreement, or any other Agreement, that conflicts with the Fund's Standard Contract Language.  Accordingly, if there *were* a conflict between the Standard Contract Language forms and either the 2009 Agreement or the 2012 Side Letter Agreement, the Standard Contract Language would control.

[53] Doc. no. 39-3 (2009 Collective Bargaining Agreement), at Art. 21, Sec. 1 (alteration supplied).

contributions based on seniority.[54]   Instead, the more important point is that, even

though Article 21 of the 2009 Agreement referenced employees' seniority dates, it

actually created contribution categories based upon job classification, not solely

based upon seniority.  To fully understand that point, it is necessary to refer back to

the 2006 Agreement.  As discussed on pages 10-14, *supra*, under the 2006 Agreement

and the Standard Contract Language forms executed on January 1, 2008, Listerhill

was obligated to contribute $5.50 per hour for all employees in the job classifications

of "Machinist" and "Mechanic."  Those employees all were assigned the Employer

Code L03B, and they all had a seniority date prior to February 10, 2006.  Listerhill

was obligated to contribute $4.55 per hour for all employees in the job classification

of "Helper."  Those employees all were assigned the Employer Code L04B, and they

all had a seniority date prior to February 10, 2006.  All other employees, who were

hired *after* February 10, 2006, were placed in one of the following job classifications:

"Mechanical Tech Machinist," Mechanical Tech Machinist Helper," "Mech Tech Gas

& Diesel Mechanic," and "Mech Tech Gas & Diesel Helper."  All of those employees

were assigned the Employer Code L22B, and they all received a contribution rate of

$0.10 per hour.  Thus, the contribution amounts due under the 2006 Agreement were

---

[54] The Fund argues that it had a "practice" of disallowing contributions based on seniority, but there is no indication in the facts or the law that the Fund's "practice" should be binding on Listerhill.

based upon job classifications, and the job classifications themselves were based upon a combination of job function *and* seniority. Even Eunice Dietz, the Fund's Manager of Education and Employer Services and its designated corporate representative, acknowledged in her supplemental declaration that, "[u]nder the collective bargaining agreement between the Union and TMC effective February 11, 2006 through February 10, 2009 (the "2006 CBA"), *TMC created job classifications based on its employees' dates of hire.*"[55] Thus, when the 2009 Agreement stated that "[e]mployees with a seniority date of less than 02/09/06 will have their pension factor as of 02/10/09 frozen,"[56] it was referring to the employees in the Machinist-Mechanic ("L03B") job classification, who had been receiving contributions of $5.50 per hour under the 2006 Agreement, and employees in the Helper ("L04B") job classification, who had been receiving $4.55 per hour. Those employees would continue to receive the same contributions under the 2009 Agreement, and all other employees would receive contributions at the rate of $0.40 per hour. In summary, the plain language of Article 21 of the 2009 Agreement demonstrates that contributions were to be based upon *job classifications*. That the job classifications themselves were based upon employees' seniority dates provides no reason to avoid that provision.

---

[55] Doc. no. 49-1 (Supplemental Declaration of Eunice Dietz), at ¶ 6 (alteration and emphasis supplied).

[56] Doc. no. 39-3 (2009 Collective Bargaining Agreement), at Art. 21, Sec. 1 (alteration supplied).

The April 23, 2012 Side Letter Agreement called for the same contribution rates based on the same job classifications: employees in the L03B classification would receive $5.50 per hour; employees in the L04B classification would receive $4.55 per hour; and all other employees, who were assigned to the L22B classification, would receive $0.40 per hour. The prefatory language of the Side Letter Agreement stated that its purpose was to continue the contributions that had been in place under the 2006 Agreement, while clarifying the administrative codes that were assigned to each job:

> This letter memorializes an agreement between Listerhill Total Maintenance Center ("TMC") and the International Association of Machinists ("IAM") to facilitate the administration of the contributions that TMC has made on behalf of TMC employees represented by the IAM since 2006 through the present to the IAM National Pension Fund under the terms of the 2006-2009 Labor Agreement, as well as the parties' current Labor Agreement.

Doc. no. 39-9 (Side Letter Agreement), at 1.

Finally, the 2012 Standard Contract Language forms also contained the same classification codes and contribution amounts: $5.50 per hour for L03B; $4.55 per hour for L04B; and $0.40 per hour for L22B.

Thus, regardless of which Agreement governs, Listerhill is required to contribute $5.50 per hour for each employee in job classification L03B, $4.55 per hour for each employee in job classification L04B, and $0.40 per hour for each

employee in job classification L22B.  The real dispute between the parties, then, is not whether contribution rates should be based upon job classification or seniority, or which rates should apply to which job classifications, but which employees fall under which job classifications.  The Fund bases its damages claim upon the number of employees falling within each of the job classifications specified in the April 26, 2012 Side Letter Roster, which were identified only by the titles "Machinist & Mechanic in Training," "Multi-craft," and "Machinist" — not by any corresponding Employer Codes.  Listerhill, on the other hand, claims that the Side Letter Roster was sent in error, and that the spreadsheet transmitted by its attorney to the Fund on January 11, 2013 accurately states which employees fall under Employer Codes L03B, L04B, and L22B.  The distinction between those two positions is significant because the Side Letter Roster identified six employees who should have been receiving contributions of $4.55 under Employer Code L04B, and forty-six employees who should have been receiving contributions of $5.50 under Employer Code L03B, resulting in more than $2 million in unpaid contributions since the implementation of the 2009 Agreement.  The January 11, 2013 spreadsheet, on the other hand, identified only one employee under L04B (who actually was retired) and five employees under L03B, resulting in a much lower financial liability on the part of Listerhill.

This central dispute cannot be resolved by reference to the plain language of the 2009 Agreement, the Side Letter Agreement, or the 2012 Standard Contract Language forms, or through application of standard rules of contract construction. Instead, the court will be required to consider testimony and other extrinsic evidence to determine the intent of the parties. As such, there are factual disputes that preclude the entry of summary judgment in favor of either party.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, it is ORDERED that both parties' motions for summary judgment are DENIED. This case will be set for pretrial conference and bench trial by separate order. *See Stewart v. KHD Deutz of America Corp.*, 75 F.3d 1522, 1527 (11th Cir. 1996) ("[N]o Seventh Amendment right to a jury trial exists in actions brought pursuant to ERISA.") (citing *Chilton v. Savannah Foods & Industries, Inc.*, 814 F.2d 620, 623 (11th Cir. 1987) (alteration supplied).

DONE this 20th day of June, 2016.

_____
United States District Judge